# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as<br>Instagram Username **minis_6**,<br>that is within the possession, custody, or control of<br>Facebook Inc., 1601 Willow Road, Menlo Park,<br>California, 94025 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.  5:21-MJ-00324 |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☒ Evidence of a crime;
☒ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| See attached affidavit | See attached affidavit |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*
Colin Schmitt, Special Agent - FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: _____

_____
*Judge's signature*
Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

AUSA: Julius J. Nam / (951) 276-6942

## AFFIDAVIT

I, Colin L. Schmitt, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   I make this affidavit in support of an application for a warrant for information associated with the account identified as Instagram user name **minis_6** (the "SUBJECT ACCOUNT") that is within the possession, custody, or control of Facebook, Inc. (the "PROVIDER"), a company that accepts service of legal process at 1601 Willow Road, Menlo Park, CA 94025, regardless of where such information is stored, held, or maintained.[1]   The information to be searched is described in Attachment A.[2]

2.   This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A),

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] On March 5, 2021, I sent the PROVIDER a preservation letter requesting that information associated with the SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).

2703(c)(1)(A) and 2703(d)[3] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

3.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of Title 18, United States Code, Sections 48(a)(1) (Animal Crushing) ("SUBJECT OFFENSE").

## II.  <u>BACKGROUND OF AFFIANT</u>

4.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since April of

---

[3] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  <u>See</u> 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (<u>see</u> Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (<u>see</u> Attachment B paragraph II.10.b.).

1997.  I am currently assigned to the Palm Springs Resident Agency of the Los Angeles Field Office, where I investigate crimes involving Frauds and Swindles, Drug Trafficking and Violent Crimes.  I have a Bachelor of Science in Accounting and a Bachelor of Science in Business Administration from the University of Missouri-Columbia.  I have a Master of Business Administration from Northeastern University.  I am a Certified Fraud Examiner as designated by the Association of Certified Fraud Examiners.  I am a Certified Anti-Money Laundering Specialist as designated by the Association of Certified Anti-Money Laundering Specialists.  I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, computer/telephone evidence identification, computer/telephone evidence seizure and processing, and various other criminal laws and procedures.  I have personally participated in the execution of search warrants involving the search and seizure of computer equipment, smartphones, documents and other indicia of criminal activity. As an FBI SA and Supervisory SA, I have participated in and supervised various federal investigations and prosecutions. Through training and discussions with the United States Attorney's Office, I have become very familiar with violations of Title 18, United States Code, Sections 48(a)(1) (Animal Crushing), 48(a)(2) (Creation of Animal Crush Videos), and 48(a)(3) (Distribution of Animal Crush Videos)).

5.    Through my training, and experience, I have become familiar with the methods of which persons injure and kill animals.  I am also familiar with analysis and posting of digital media through various child porn investigations that I have participated.  I have attended various general fraud, money laundering, drug trafficking, violent crime, healthcare fraud and white collar investigative trainings sponsored by the FBI and other organizations.  I have participated in and supervised investigative activities, arrest and search warrants, interviews, consensually-recorded conversations, trial preparation, bank record analysis, telephone toll record analysis and subpoena preparation.  As a result of my training and experience, I am familiar with federal laws relating to animal crushing, as well as, investigative techniques related to investigation of violent crime.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. **THE ANIMAL CRUSH VIDEO PROHIBITION ACT OF 2010 AND THE PREVENTING ANIMAL CRUELTY AND TORTURE ACT OF 2019, 18 U.S.C. § 48**

7.     This investigation concerns alleged violations of Title 18, United States Code, Section 48(a), which generally[4] prohibits any person to (1) "purposely engage in animal crushing in or affecting interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States," (2) "knowingly create an animal crush video if the person intends or has reason to know that the animal crush video will be distributed in, or using a means or facility of, interstate or foreign commerce, or the animal crush video is distributed in, or using a means or facility of, interstate or foreign commerce," and (3) "knowingly sell, market, advertise, exchange, or distribute an animal crush video in, or using a means or facility of, interstate or foreign commerce."

8.     The following definitions and descriptions apply to this Affidavit:

a.     "Animal crushing," as defined in 18 U.S.C. § 48(f)(1), means "actual conduct in which one or more living non-human mammals, birds, reptiles, or amphibians is purposely

---

[4] Notably, the statute "does not apply with regard to any conduct, or a visual depiction of that conduct, that is (A) a customary and normal veterinary, agricultural husbandry, or other animal management practice; (B) the slaughter of animals for food; (C) hunting, trapping, fishing, a sporting activity not otherwise prohibited by Federal law, predator control, or pest control; (D) medical or scientific research; (E) necessary to protect the life or property of a person; or (F) performed as part of euthanizing an animal." 18 U.S.C. § 48(d)(1). The statute also does not apply to "unintentional conduct that injures or kills an animal." 18 U.S.C. § 48(d)(3).

crushed, burned, drowned, suffocated, impaled, or otherwise
subjected to serious bodily injury (as defined in [18 U.S.C.
§ 1365] and including conduct that, if committed against a
person and in the special maritime and territorial jurisdiction
of the United States, would violate [18 U.S.C. §§ 2241 or
2242])."

       i.  "Serious bodily injury" is defined in 18
U.S.C. § 1365(h)(3) as "bodily injury which involves -- (A) a
substantial risk of death; (B) extreme physical pain;
(C) protracted and obvious disfigurement; or (D) protracted loss
or impairment of the function of a bodily member, organ, or
mental faculty."

       ii.  "Bodily injury" is further defined in 18
U.S.C. § 1365(h)(4) as "(A) a cut, abrasion, bruise, burn, or
disfigurement; (B) physical pain; (C) illness; (D) impairment of
the function of a bodily member, organ, or mental faculty; or
(E) any other injury to the body, no matter how temporary."

       iii. "Serious bodily injury," as referenced in 18
U.S.C. §§ 2241, 2242, is defined in 18 U.S.C. § 2246(4) as:
"bodily injury that involves a substantial risk of death,
unconsciousness, extreme physical pain, protracted and obvious
disfigurement, or protracted loss or impairment of the function
of a bodily member, organ, or mental faculty."

      b.  "Animal crush video," as defined in 18 U.S.C.
§ 48(f)(2), means "any photograph, motion-picture film, video or
digital recording, or electronic image that -- (A) depicts
animal crushing; and (B) is obscene."

## IV.  <u>SUMMARY OF PROBABLE CAUSE</u>

9.  On February 13, 2021, the Riverside Police Department ("RPD") in Riverside, California received a report that RAMOS-CORRALES had posted on Snapchat, a multimedia messaging application used on smartphones, a video of a dog whose throat had been slit and who was gasping for air and wailing ("Snapchat Video").

10.  That day, RPD officers met with the reporting person and reviewed the Snapchat Video on that person's smartphone. The video showed a small brown dog lying on its right side with a large laceration to the neck.  The accompanying caption at the bottom of the video read, "Tha next one rinnin issa soal."  The video also captured a person believed to be RAMOS-CORRALES saying, "I smoked his little ass.  Like that homie, this is real life.  I ain't no bitch, I'm cold hearted.  Mo-fucker is dead."

11.  On the evening of February 13, 2021, RPD officers arrived at a residence on Lou Ella Lane in Riverside, California, which officers knew to be RAMOS-CORRALES's residence.  Officers found RAMOS-CORRALES at the residence with fresh blood stains on his clothes, fresh cut wounds on his hands, and illegal brass knuckles on his person.  During a subsequent safety sweep of the residence, officers found a small brown dog lying on a bed with a deep gash on the throat.

12.  An RPD officer read RAMOS-CORRALES his Miranda warnings, and he agreed to answer questions.  RAMOS-CORRALES stated the dog had become "moody" with him due to pooping inside his cage.  The dog nipped RAMOS-CORRALES which caused him to

lose control.  RAMOS-CORRALES called himself a "cold blooded
killer" and said he could not stop himself from hurting the dog.
RAMOS-CORRALES identified his cellphone as a silver Samsung
Galaxy with a black case, which was later recovered by the RPD.[5]

13.  On March 4, 5, and 10, 2021, I -- with other FBI
Special Agent(s) -- interviewed RAMOS-CORRALES who admitted that
he had slit his dog's throat, although he repeatedly claimed
that he didn't remember how he had done it.

14.  On April 23, 2021, the Honorable Sheri Pym, United
States Magistrate Judge, approved a criminal complaint and a
warrant to arrest RAMOS-CORRALES for a violation of 18 U.S.C.
§ 48(a)(1) (Animal Crushing) committed on February 13, 2021.

15.  On April 26, 2021, FBI agents and RPD officers
arrested RAMOS-CORRALES at his Lou Ella Lane residence in
Riverside.  RAMOS-CORRALES made his initial appearance in the
Riverside federal courthouse on the same day and was released on
$15,000 bond.

16.  On April 29, 2021, I received a copy of a video from a
witness who told me that she had recorded the video on February
13 or 14, 2021 after RAMOS-CORRALES had posted the video on his
Instagram account.  The 18-second video, which was saved using
the witness's phone's screen recording feature, shows RAMOS-
CORRALES's dog appearing to be unable to control its body and
continually falling head first.  At approximately the 13-second
mark, RAMOS-CORRALES appears in the video drinking what appear

---

[5] In a concurrent but separate search warrant application, I
am applying for a search warrant to search this Samsung Galaxy
cellphone.

to be two shots of alcohol.  The video shows that it was posted on the Instagram minis_6 account approximately eight hours earlier.

## V.   <u>STATEMENT OF PROBABLE CAUSE</u>

17.  Based on my review of the reports produced and evidence gathered, conversations with law enforcement officers and witnesses, and participation in this investigation, I am aware of the following.

**Riverside Police Investigation**

18.  On March 4, 2021, I reviewed an RPD report submitted by RPD Officer Devan HUSSEY ("HUSSEY") in File number 210004466, dated February 24, 2021, and learned the following:

a.   On February 13, 2021, at approximately 7:45 p.m., HUSSEY and RPD Officer Devin DURAN responded to a residence on Lou Ella Lane, Riverside, California for a potential animal cruelty investigation.

b.   Before going to that address, HUSSEY contacted the initial reporting person ("RP").  The RP told HUSSEY that she was contacted at around 6 p.m. that day by an acquaintance of RAMOS-CORRALES who asked the RP to report RAMOS-CORRALES's posting of a video of a dog with its throat slit on Snapchat. The RP said RAMOS-CORRALES had admitted to the killing and stated there was more to follow.  The RP gave HUSSEY RAMOS-CORRALES's name and his residential address on Lou Ella Lane in Riverside.  The RP described RAMOS-CORRALES as a 19-year-old Hispanic male.

c.   The RP also provided a copy of the video (the "Snapchat Video"), which RAMOS-CORRALES's acquaintance had sent the RP, to HUSSEY.  HUSSEY reviewed the copy of the Snapchat Video on the RP's phone, which was approximately 20 seconds long.  HUSSEY described the video as follows:

> "A small brown dog is seen laying on its right side with a large laceration to the neck.  Next to the dog was an open bottle of hydrogen peroxide and a black collar, which appear cut.  A caption at the bottom of the screen read, 'Tha next one rinnin issa soal.'  The dog is heard whaling and gasping for air[6] as [RAMOS-CORRALES] stands over the body.  The video captures [RAMOS-CORRALES] saying, "I smoked his little ass. Like that homie, this is real life. I ain't no bitch, I'm cold hearted. Mo-fucker is dead." During these statements, [RAMOS-CORRALES] made finger gestures at the dog's body, similar to portraying gang signs.  At no point did [RAMOS-CORRALES] attempt to help care for the dog.  The video concluded after the statement."

d.   Upon arrival at the Lou Ella Lane address, HUSSEY observed a young Hispanic adult male wearing a light gray hoodie, dark jeans, and black shoes, exit the residence.  The

---

[6] Based on my further investigation, I do not believe the wailing and gasping sound was coming from the dog.  Instead, as confirmed to me later by RAMOS-CORRALES's sister, J.R., the wailing sound was coming from J.R. who was crying due to the injury to the dog, which J.R. shared with RAMOS-CORRALES. Because J.R. was crying while the Snapchat Video was being video recorded by J.R.'s boyfriend using a different phone, the sound of J.R.'s wailing was recorded with the Snapchat Video.

man appeared to fit the description of RAMOS-CORRALES that the RP had given and the clothing worn by the person in the Snapchat Video.  When the man saw the police vehicle, he started to retreat back into the residence.  HUSSEY asked the man to come over to the officers before he entered the residence.  The man complied and came toward the officers, but he appeared to be very nervous and suspicious.

e.   The man identified himself as RAMOS-CORRALES. HUSSEY observed fresh blood stains on RAMOS-CORRALES's hoodie and cut wounds on his hands.

f.   Based on the suspected animal cruelty conduct and potential weapons involved in that conduct, HUSSEY did a patdown search of RAMOS-CORRALES and found black brass knuckles, an illegal weapon in violation of California Penal Code Section 21810.  After the discovery of the illegal weapon, RAMOS-CORRALES was detained and handcuffed.

g.   HUSSEY asked RAMOS-CORRALES about other occupants inside the Lou Ella Lane residence.  He stated he had a roommate who was inside, but he refused to say where his roommate would be located inside.

h.   Due to the reported violence at the residence, RAMOS-CORRALES's fresh wounds and blood stains, recovered weapon, and suspicious behavior, and acknowledged presence of a roommate inside the residence, HUSSEY believed there was an exigent circumstance to enter the residence to ascertain the safety of the roommate.

i.   HUSSEY entered the residence and conducted a safety sweep of the residence.  During the sweep, HUSSEY observed a small brown dog laying on a bed with its throat cut. HUSSEY continued the sweep and found the roommate, M.C., in a different bedroom.  HUSSEY escorted M.C. out of the residence.

j.   After exiting the residence, HUSSEY told RAMOS-CORRALES that he was doing an animal cruelty and brass knuckles possession investigation.  HUSSEY read RAMOS-CORRALES his Miranda rights and asked him if he was willing to speak about the incident.  RAMOS-CORRALES agreed to answer HUSSEY's questions and gave the following statements:

i.   RAMOS-CORRALES said he was inside his room most of the day, alone with the dog, and smoking marijuana.

ii.  He stated the dog became "moody" and pooped inside his cage.  The dog was also nipping at RAMOS-CORRALES, which caused him to lose control.

iii. RAMOS-CORRALES claimed he did not recall exactly what he did to the dog, but stated the dog was "still breathing."  He referred to himself as a "cold blooded killer" and said he could not stop himself from hurting the dog.  But he also said he felt remorse for what he did to the dog and said he even put cleaning alcohol on the dog to help after cutting the dog's throat.

iv.  RAMOS-CORRALES stated that after his brother had been transformed by gang violence, he became "cold" and wanted to cause pain.

v.   When asked why he posted the Snapchat Video, RAMOS-CORRALES refused to answer, but asked how RPD discovered his posts.  He did identify his cellphone as the silver Samsung Galaxy with a black case on the bed.

vi. RAMOS-CORRALES could not identify the knife used to injure the dog but kept saying he hurt the dog because he was a cold-blooded killer.

vii. RAMOS-CORRALES stated he did not have mental health issues, that he had not previously harmed an animal, or that he was homicidal.

k.   RAMOS-CORRALES then gave consent for the officers to search his bedroom.  During the search, HUSSEY recovered a short silver knife on RAMOS-CORRALES's bed and a longer silver knife near the residence's front door.  RAMOS-CORRALES's silver Samsung Galaxy cellphone was recovered from his bed.

l.   The Samsung Galaxy, in addition to the black brass knuckles and other evidence gathered, was booked into RPD Evidence.

m.   Officer DURAN took 88 digital photographs of the crime scene and attached them to RPD File Number 210004466.

19.  On March 4, 2021, I reviewed an RPD report submitted by RPD Officer Sergio MERCADO ("MERCADO") in File number 210004466-001, dated February 24, 2021, and learned the following:

a.   Sometime after 7:42 p.m. on February 13, 2021, while Officers HUSSEY and DURAN were investigating RAMOS-CORRALES, MERCADO arrived with his partner, RPD Officer LaPoint,

and assisted with the interview of M.C. in Spanish, outside RAMOS-CORRALES's residence.

    b.   M.C. said he rented a room in RAMOS-CORRALES's residence and knew that RAMOS-CORRALES was the landlord's son.

    c.   M.C. said at approximately 5:00 p.m. that day, he returned to the residence and saw that RAMOS-CORRALES appeared to be upset and yelling unknown words in his bedroom.

    d.   M.C. said he saw the puppy wrapped in a bathroom floor rug, while RAMOS-CORRALES was in his room yelling.

    e.   M.C. said he also saw blood splatters and became concerned for his own safety, so M.C. then locked himself in his own bedroom.

    f.   M.C. said he did not witness RAMOS-CORRALES harming the dog.

    20.  Later in the evening of February 13, 2021, Riverside County Animal Control arrived at the Lou Ella Lane address and took custody of the dog, which was still alive.  Based on my review of the report from Animal Control dated February 13, 2021 at 10:05 p.m., I am aware of the following:

    a.   When the dog was examined by a veterinarian with Animal Control, the dog was determined to be about 10 weeks old.

    b.   The dog exhibited "rythmic [sic] tremors affecting all 4 legs," and had "apparently experienced severe blunt trauma to the head and face bilateral[ly]," with the head "distorted with severe swelling and deformity."

c.    The dog suffered from a "clean cut laceration . . . of neck on the jugular region measuring 4.4 cm," with the laceration "cut through dermis."

d.    The dog nonetheless had a pulse of 80 beats per minute, although it was non-responsive.

e.    An X-ray of the dog showed that it had bilateral zygomatic arch fractures on the head and a left rib fracture.

f.    The dog was subsequently euthanized through the use of an injection, after which the dog "died instantly/peacefully."

**Review of Snapchat Video and Digital Photographs**

21.    On March 4, 2021, I reviewed the Snapchat Video referenced in HUSSEY's RPD report, in File Number 210004466.  My observation of the Snapchat Video was generally consistent with the observations made by HUSSEY.  The video was approximately 20 seconds long.

22.    On March 4, 2021, I reviewed the digital photographs referenced in HUSSEY's RPD report, in File Number 210004466, and saw the following, among many others:

a.    Photo File L2E80108.jpg depicted a brown dog lying on his right side on top of a bed along with a silver Samsung cellphone and a silver knife.  Blood stains were shown on the floorboard in front of the bed.

b.    Photo File L2E80129.jpg depicted a blood stain on the wall next to the bed in which the dog was lying.

c.    Photo File L2E80143.jpg depicted a blood stains on the bathroom sink used by RAMOS-CORRALES.

15

d.    Photo File L2E80155.jpg depicted feces inside a dog cage.

e.    Photo File L2E80157.jpg depicted RAMOS-CORRALES after his arrest, wearing a light gray hoodie that appeared to have a blood stain.

f.    Photo File L2E80166.jpg depicted RAMOS-CORRALES's hands that appeared to have bite marks.

23.  On March 4, 2021, during my review of the RPD File Number 210004466, I reviewed an RPD Notice to Appear, serial number 801860, written to "Angel Ramos," with a date of birth in 2002.  The charges, both felonies, were listed as PC 597(B), Animal Cruelty, and PC 21810, Possession of Metal Knuckles.

24.  Also on March 4, 2021, I queried law enforcement database and found the California Driver's License ("CDL") information for RAMOS-CORRALES under CDL ending in 5939.  I reviewed the photo for CDL ending in 5939 and compared the attached photo with photo file L2E80157.jpg, described above. The persons depicted in both photos appeared to be the same person.  As further discussed below, on March 5, 2021, I met with RAMOS-CORRALES and confirmed that he was the same person depicted the RPD photos and CDL photo.

**Follow-up Interviews of RAMOS-CORRALES and Witnesses**

25.  On March 4 and 5, 2021, FBI SA Travis Rankin, Jazmin Vidana, and I conducted interviews of witnesses in this investigation, as well as a Mirandized interview of RAMOS-CORRALES.  The following are summaries of those interviews relevant to this search warrant application.

26.  On March 4, 2021, FBI SA Rankin, Vidana, and I met with RAMOS-CORRALES at his Lou Ella Lane residence.  I gave a Miranda warning to RAMOS-CORRALES, and he agreed to speak with us.  RAMOS-CORRALES said the following to us:

a.  RAMOS-CORRALES identified himself as the person who posted the Snapchat Video but claimed he did not recall the details of what he did.  He claimed that he had taken a mix of drugs and alcohol.

b.  RAMOS-CORRALES said the name of the dog was "Canelo," which he bought for $30 from a family that placed the dog for sale through a posting on Craiglist, online classified advertisements website.  RAMOS-CORRALES said he bought the dog about four or five months earlier when the dog was a small puppy.

c.  When RAMOS-CORRALES was shown a photograph of the Samsung Galaxy that RPD took on February 13, 2021, he acknowledged that the phone was his.

d.  RAMOS-CORRALES also acknowledged that he used Snapchat and Instagram, as his social media.  RAMOS-CORRALES provided his Snapchat and Instagram names:

i.  His Snapchat display name is "Chencho" and user name is "bln00100".

ii.  His Instagram user name is "minis_6".

e.  Although RAMOS-CORRALES said he did not recall what exactly he did to Canelo, he admitted he had flashbacks of the incident and recalled pouring alcohol over the dog.  He also stated that he posted to Snapchat at least one photo of himself

drinking alcohol on the same night of the incident.

27. On March 4, 2021, FBI SA Rankin, Vidana, and I met with J.R., sister of RAMOS-CORRALES, at the Lou Ella Lane residence. J.R. said the following to us:

a. J.R. said she was RAMOS-CORRALES's older sister and she also lived in the Lou Ella Lane residence.

b. J.R. said she learned about RAMOS-CORRALES's slitting of his dog while she was traveling in Mexico. One of her cousins called J.R. to let her know that RAMOS-CORRALES had posted a video of injury to the dog on social media.

c. J.R. said she was not aware of RAMOS-CORRALES harming animals or posing other similar videos of causing injury to animals.

d. J.R. said her oldest brother was in and out of prison. She said RAMOS-CORRALES was a sort of a "poser" who might have wanted to impressed other people by posting the Snapchat Video. She thought RAMOS-CORRALES might be trying to impress their older brother who is currently in prison.

e. After listening the audio of a video recording of the Snapchat Video that the RPD obtained from the RP, J.R. said the sound of wailing heard in the video is that of herself crying over the injury to the dog.

28. On March 5, 2021, FBI SA Rankin, Vidana, and I met with RAMOS-CORRALES for a follow-up interview at the Lou Ella Lane residence. I gave a <u>Miranda</u> warning to RAMOS-CORRALES, and he agreed to speak with us. RAMOS-CORRALES said the following to us:

a.   RAMOS-CORRALES had been home all day on the day he slit the dog's throat.  He had started drinking in the morning, listened to music, and exchanged text messages with other people, including on Snapchat.

b.   RAMOS-CORRALES still said he did not recall the details of what he did to the dog and why he did it.

c.   RAMOS-CORRALES said a cousin (whose name he said he did not recall) called him at some point after he posted the video to ask what he was doing.

d.   RAMOS-CORRALES said he "freaked out" after he realized that he had slit the dog's throat.

e.   RAMOS-CORRALES said he did not recall how many people viewed, responded to, or saved the video he posted.

29.   During the same interview on March 5, 2021, RAMOS-CORRALES showed us his Snapchat account on his new cellphone and agreed to have us take a look at his postings and chats from February 13, 2021.  We reviewed RAMOS-CORRALES's "friend" list and saw that there were 19 people on the list.

**Interview of Individuals Who Sold the Dog to RAMOS-CORRALES**

30.   On March 30, 2021, FBI SAs James Lamothe and Steven Gale interviewed J.G. and D.R., husband and wife, in their residence in Apple Valley, California.  During the interview, J.G. stated that he and his wife sold a dog to RAMOS-CORRALES, as identified through a photograph of RAMOS-CORRALES.  Based on my review of the report completed by SA Lamothe and Gale and my conversation with the two SAs, I am aware of the following:

a.   When shown a photograph of RAMOS-CORRALES, J.G.

stated that he recognized the male in the photograph as the person who bought a dog from J.G. and his family.  J.G. stated that his family had posted a Craigslist ad using D.R.'s email address to sell a recently born puppy that the family had.  J.G. said when RAMOS-CORRALES came to buy the puppy, he was accompanied by a female, short in height.

b.    J.G. said that the puppy was being sold for $30, and there were two people interested in buying the puppy.  J.G. said RAMOS-CORRALES was eager to buy the puppy and offered to pay $45 to come pick the puppy up as soon as possible.

c.    J.G. recalled that RAMOS-CORRALES was driving from Riverside.

31.  During the interview, J.G. and D.R. provided SAs Lamothe and Gale with copies of emails and messages showing communications concerning the sale of the dog.

**Execution of Search Warrants**

32.  On March 9, 2021, the Honorable Sheri Pym, United States Magistrate Judge, approved two search warrants in this investigation for (1) RAMOS-CORRALES's Snapchat account under user name "bln00100" and display name "Chencho," in case number ED 21-MJ-150, and (2) a Samsung Galaxy belonging to RAMOS-CORRALES, in case number ED 21-MJ-151.

33.  Between March 9 and 23, 2021, I conducted a search of RAMOS-CORRALES's Samsung Galaxy pursuant to the search warrant in case number ED 21-MJ-151.  During that search, I found the following, among others:

a.    Text/instant messages showing that RAMOS-CORRALES

bought the deceased dog on November 16, 2020 from a person who had the telephone number of 909-831-XXXX, residing in Apple Valley, California, with the same address as J.G. and D.R.

b.   A message string with 909-831-XXXX detailing conversations regarding the dog purchase transaction on November 15, 2020.

34.   On April 21, 2021, Snapchat produced information and digital data responsive to the search warrant pursuant to 18 U.S.C. § 2703 in case number ED 21-MJ-150.

a.   Within that production were copies of the Snapchat Video depicting a dog with the throat slit, along with the "overlay" file that showed the text associated with the Snapchat Video, "The next one I rinnin  issa soal," dated February 13, 2021, at 6:42 p.m.

b.   After watching the Snapchat Video, I confirmed that that video was the same video that the initial reporting party (RP) provided to the RPD on February 13, 2021, but without the wailing sound that I previously learned was made by RAMOS-CORRALES's sister, as described above.

c.   I also saw that, toward the end of the Snapchat Video, RAMOS-CORRALES kicked the dog callously and said, "Mo-fucker is dead."

d.   Also in the same production was the content of Snapchat messages exchanged between RAMOS-CORRALES's account bln00100 and his Snapchat friends, which included other individuals addressing bln00100 as "Angelllll" and bln00100 providing RAMOS-CORRALES's Lou Ella Lane address to another

person.

    e.   The Snapchat message content included messages
exchanged starting at 6:43 p.m. on February 13, 2021.[7]  Those
messages showed RAMOS-CORRALES's bln00100 account sending out
multimedia messages to several others at 6:43 p.m., consistent
with the posting of a video to a group.  At 6:44 p.m., one
individual wrote to bln00100, "Eww."  At 7:13 p.m., another
individual wrote, "Foo I hope you didn't [sic] do that [J.R.]
is doing the most rn."  At 7:31 p.m., a third individual wrote,
"You just need to stop hanging out with the wrong crowd."

    f.   Also in the same Snapchat production was another
video dated February 25, 2021, showing a man in possession of
what appears to be marijuana and making the same "gang sign"
finger gesture with the left hand in the same manner that RAMOS-
CORRALES made a finger gesture in the Snapchat Video.  Although
the man's face is not visible, the man is wearing the same
colored and brand of shoes as RAMOS-CORRALES in the Snapchat
Video and the flooring shown on this video is the same as the
flooring shown in the Snapchat Video.

**Criminal Complaint Against and Arrest of RAMOS-CORRALES**

    35.  Based on the above facts, on April 23, 2021 I
submitted a complaint against RAMOS-CORRALES for Animal Crushing
in violation of 18 U.S.C. § 48(a)(1).  The Honorable Sheri Pym,
United States Magistrate Judge, approved the complaint on the

---

        [7] The time marks on the chat log are in Universal Time
Coordinated ("UTC") time, which was eight hours ahead of Pacific
Standard Time ("PST") on February 13, 2021.  Thus, chat messages
logged as taking place on February 14, 2021 at 2:43 a.m. UTC was
on February 13, 2021 at 6:43 p.m.

same day and issued an arrest warrant for RAMOS-CORRALES.

36.  On April 26, 2021, agents of the FBI and officers of the RPD arrested RAMOS-CORRALES pursuant to the arrest warrant. He made his initial appearance in the Riverside federal courthouse that afternoon and was released on $15,000 bond with numerous conditions.

**RAMOS-CORRALES's Instagram Video Provided by a Witness**

37.  On April 29, 2021, I received an email from B.R. who has an Instagram account and was one of RAMOS-CORRALES's Instagram followers until mid-February 2021.  Attached to the email was an 18-second video file.  When I reviewed the video, I saw that the video appeared to show RAMOS-CORRALES's dog while it was still alive and RAMOS-CORRALES in his Lou Ella Lane residence.  The video also appeared to be a recording of a video associated with "minis_6," the user name of RAMOS-CORRALES's Instagram account (the "Instagram Video").

38.  From the beginning to the 12-second mark, the Instagram Video shows RAMOS-CORRALES's dog appearing to be unable to control its body and continually falling head first, as if it was suffering from a seizure.  But the dog does not appear to have the laceration on its throat as shown in the Snapchat Video.

39.  At approximately the 13-second mark, the Instagram Video cuts to RAMOS-CORRALES who says something in Spanish very quickly and unintelligibly and drinks what appear to be two shots of clear alcohol back to back.

40.  The video shows that it was posted on the Instagram

minis_6 account approximately eight hours earlier.  The video also includes the time mark of "12:48" without indicating a.m. or p.m.

41.  After reviewing the video, I contacted B.R., the sender, who told me that she knew RAMOS-CORRALES and followed his Instagram account and saw that he had posted the Instagram Video on the minis_6 account.  B.R. used her cell phone's screen recording feature to record the Instagram Video sometime on February 13 or 14, 2021.  After that, B.R. stopped following RAMOS-CORRALES's minis_6 account.

42.  Based on what the video shows and what B.R. told me, I believe RAMOS-CORRALES posted the Instagram Video after causing a serious bodily injury to his dog but before he slit his dog's throat.

43.  As described above, the veterinarian at Animal Control who examined the dog observed that the dog exhibited "rythmic [sic] tremors affecting all 4 legs," had "apparently experienced severe blunt trauma to the head and face bilateral[ly]," with the head "distorted with severe swelling and deformity," and had bilateral zygomatic arch fractures on the head and a left rib fracture.  The Instagram Video, which must have been posted some time before the Snapchat Video, appears to show the dog exhibiting symptoms consistent with the injuries noted by the veterinarian.

**Probable Cause to Search the SUBJECT ACCOUNT**

44.  Based on the foregoing as well as my training and experience on digital devices set forth below, I believe there

is probable cause to believe that the SUBJECT ACCOUNT was used to distribute at least one video of RAMOS-CORRALES's animal crushing conduct on or before February 13, 2021, and that the SUBJECT ACCOUNT contains evidence, fruits, and instrumentalities of the SUBJECT OFFENSE.

### VI.   BACKGROUND ON SOCIAL MEDIA AND E-MAIL ACCOUNTS AND THE PROVIDER

27.   In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.   Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNT. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.   Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).   Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.   In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

28.   Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNT.

29.   A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

30.   In my training and experience, social media and e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, social media and e-mail providers often have records of the IP

address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the SUBJECT ACCOUNT.

31. In my training and experience, social media and e-mail account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNT.

32. I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time. Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to

show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account.  Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of the SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with the SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

33.  Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNT.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

34.  I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to

express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

35.  This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

36.  As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

37.  I make that request because I believe it might be impossible for a provider to authenticate information taken from the SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from the SUBJECT ACCOUNT.

38.  I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

39.  Passwords (and Hashes and Salt): The subscriber will also generally need to use a password that will allow the user to gain access to the account.  Many providers do not store the

password directly, rather they use an algorithm (often referred to as a "hashing" algorithm) that is performed on the password and generates a new random of string of numbers and characters, which is what the provider may store.  When a user enters his or her password, the hashing algorithm is performed on the password before it is presented to the provider, and the provider will verify the hash value for the password (rather than the password itself) to authorize access to the account.  As an added security feature, some providers insert additional text before or after the password, which additional text is referred to as "salting" the password.  The hashing algorithm is then performed on the combined password and salt, which is the hash value that will be recognized by the provider.  Alternatively or in addition to passwords, users may be required to select or propose a security question, and then provide an answer, which can be used to substitute for a password or to retrieve or reset a user's password.

40.  I know based on my training and experience that providers of e-mail or social media services generally have access to and store the web or Internet browsing history of the user while he or she is logged into an account.  That history can include the names and specific websites or URLs/URIs (Uniform Resource Locators or Indicators) of the sites that have been visited.

41.  Providers of similar services will often keep track of what is referred to as user agent string, which contains information about the type of computer, operating system, and

web browser used to access the service.  User agent string can include:  web requests or HTTP requests (hypertext transfer protocol is the protocol by which many web pages are transmitted between servers and clients or users); logs containing information such as the requestor's IP address, identity and user ID, date and timestamp, request URL or URI (Uniform Resource Locator or Indicator, i.e., a website address), HTTP protocol version, referrer, and similar information; login tracker logs; account management logs; and any other e-mail or social media accounts accessed by or analytics related to the SUBJECT ACCOUNT.  These can be used to determine the types of devices used while accessing the SUBJECT ACCOUNT, as well as data related to the user's activity while accessing the SUBJECT ACCOUNT.

42.  I have also learned that providers of social media and e-mail services often track the behavior and activities of persons using accounts by using cookies, which are strings of characters and numbers stored on a person's computer on their web browser.  These cookies can often show whether more than one account was accessed by the same computer (and specifically the same web browser), as the provider can recognize that cookie when the same device returns to the service to access an account.

43.  In order to identify other accounts used or maintained by the user of the SUBJECT ACCOUNT, the warrant also calls for the PROVIDER to disclose both (1) any cookies associated with the SUBJECT ACCOUNT, i.e., those cookies that were placed on any

computers or web browsers (for example, Internet Explorer or
Google Chrome) used to access the SUBJECT ACCOUNT, and (2) the
identity of any other account in which the same cookie or
cookies used to access the SUBJECT ACCOUNT was/were recognized.
If in the course of the investigation the digital devices used
by the subject(s) of the investigation are found, they can be
searched to determine if the cookies recognized by the provider
are stored on those devices.  The warrant also calls for the
PROVIDER to identify any other accounts accessed by any computer
or web browser using the same cookies as the SUBJECT ACCOUNT by
providing subscriber records and log-in information for those
other accounts (but not to provide the contents of
communications in those other accounts).

        44.  Common Subscriber Record Information:  Users of
accounts are often required to include an e-mail account as well
as a phone number in subscriber records.  The e-mail account may
be an e-mail account hosted at the same provider, or an account
at a different provider.  The e-mail account is referred to by a
number of names, such as a secondary e-mail account, a recovery
e-mail account, or an alternative e-mail account or
communication channel.  That e-mail account is often used when
the identity of the user of the primary account (here, the
SUBJECT ACCOUNT) needs to be verified, for example if a password
is forgotten, so that the provider can confirm that the person
trying to access the account is the authorized user of the
account.  Similarly, the telephone number used in subscriber
records is often used to send a passcode via text (or "SMS")

that must be presented when trying to gain access to an account, either in a similar scenario where a user forgot his or her password, or when users implement what is referred to as "two-factor authentication" (where the password is one factor, and the passcode sent via text message to a mobile device is a second). In either scenario, the user of a primary e-mail account (the SUBJECT ACCOUNT) and a secondary e-mail account or phone number listed in subscriber records are very often the same person, or at least are close and trusted and/or working in concert. That is because access to either the secondary e-mail account or to the phone number listed in subscriber records can allow access to the primary account.

45. Search History: In my training and experience, providers also keep a record of search queries run by the user of the account, whether searches within the services of the provider for persons, content, or other accounts (such as if a user is trying to find the account of an acquaintance), or broader Internet searches. In some instances, providers may also keep records of which websites or contents were "clicked on" as a result of these searches. This information is helpful in the context of the case to show the topics about which the user was trying to obtain more information or conduct research, and is relevant for "user attribution" evidence, analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

46. Providers also frequently obtain information about the types of devices that are used to access accounts like the

SUBJECT ACCOUNT.  Those devices can be laptop or desktop computers, cellular phones, tablet computers, or other devices. Individual computers or devices are identified by a number of different means, some of which are assigned to a particular device by a manufacturer and connected to the "hardware" or the physical device, some are assigned by a cellular telephone carrier to a particular account using cellular data or voice services, and some are actually assigned by the provider to keep track of the devices using its services.  Those device identifiers include Android IDs, Advertising IDs, unique application numbers, hardware models, operating system versions, unique device identifiers, Global Unique Identifiers or "GUIDs," serial numbers, mobile network information, phone numbers, device serial numbers, Media Access Control ("MAC") addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"). Apple, one of the primary suppliers of mobile devices used to access accounts like the SUBJECT ACCOUNT, had previously used an identifier that was unique to the hardware of its devices, such that details of a device's activity obtained from a particular application or "app" could be used to target advertisements for the user of that device.  Apple replaced that hardware-based identifier with the Apple advertiser ID or IDFA that is still

unique to a particular device, but which can be wiped and re-
generated anew by a user if a user chooses to do so.  Most
users, however, do not know that the IDFA exists, and therefore
are unaware that their device's activity can be correlated
across different apps or services.  Google uses a similar
advertiser ID referred to as an AAID.

47.  These device identifiers can then be used (a) to
identify accounts accessed at other providers by that same
device, and (b) to determine whether any physical devices found
in the course of the investigation were the ones used to access
the SUBJECT ACCOUNT.  The requested warrant therefore asks for
the device identifiers, as well as the identity of any other
account accessed by a device with the same identifier.

48.  Providers of social media and e-mail often maintain,
have access to, and store information related to the location of
the users of accounts they service.  That information may be
obtained by the provider in a number of ways.  For example, a
user may access the provider's services by running an
application on the user's phone or mobile device, which
application has access to the location information residing on
the phone or mobile device, such as Global Positioning System
(GPS) information.  It may also be accessible through "check-in"
features that some providers offer that allow users to transmit
or display their location to their "friends" or "acquaintances"
via the provider.

## VI.   <u>SERVICES PROVIDED BY INSTAGRAM</u>

49.  Based on a review of information provided by Instagram (operated by Facebook, Inc.) regarding its services, information provided by other law enforcement officers, and/or my training and experience, I am aware of the information contained in this section of the affidavit regarding Instagram.

50.  Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com.  Instagram allows its users to create their own profile pages, which can include a short biography, or "bio," a photo of themselves, and other information.  Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

51.  Instagram permits users to post photos and videos to their profiles on Instagram and otherwise share photos and videos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter. When posting or sharing a photo or video on Instagram, a user can add the following to the photo/video: a caption; various "tags" that can be used to search for the photo/video (e.g., a user may add the tag "#vw" so that people interested in Volkswagen vehicles can search for and find the photo/video); location information, including geotags or a location name; and other information.  A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos and videos.  In addition, Instagram allows users to make

comments on posted photos and videos, including photos and videos that the user posts or photos and videos posted by other users of Instagram.  Users can also "like" photos and videos, meaning that they can express approval of a photo or video by using Instagram's "like" feature.

52.  Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

53.  Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This subscriber information may include the user's full name, e-mail addresses, and phone numbers, as well as other personal information provided directly by the user to Instagram.  Once an account is created, users may also adjust various privacy and account settings for the account on Instagram.  Instagram collects and maintains this information.

54.  Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public.  Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles.  Instagram collects and maintains this information.

55.  Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user.  Users may also "unfollow" users, that is, stop

following them or block them, which prevents the blocked user from following that user.

56.   Instagram allows users to post and share various types of user content in their galleries, including photos, videos, captions, comments, and other materials.  Such items can contain metadata, i.e., content about the data such as the date and time the photo or video was taken.  Instagram collects and maintains user content that users post to Instagram or share through Instagram.

57.   Instagram users may send photos and videos to select individuals or groups via Instagram Direct.  Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

58.   Users on Instagram may also search Instagram for other users or particular types of photos or other content.

59.   For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app.  Among the log file information that Instagram's servers automatically record are the particular web request, any Internet Protocol ("IP") address associated with the request, the type of browser used, any referring/exit web pages and associated URLs, the pages viewed, the dates and times of access, and other information.

60.   Instagram also collects other data associated with user content.  For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags"

that mark the location of certain activities, such as where a
photo or video was taken, and which may include latitude and
longitude information, comments on photos, and other
information.  Such information can assist in plotting the
location of photographs, videos, or other content posted by the
user, which would be evidence of the user's location, or similar
information by persons followed by or in contact with the user.

61.  As explained herein, information stored in connection
with an Instagram account may provide crucial evidence of the
"who, what, why, when, where, and how" of the criminal conduct
under investigation, thus enabling the United States to
establish and prove each element or alternatively, to exclude
the innocent from further suspicion.  In my training and
experience, an Instagram user's account activity, IP address
logs, stored electronic communications, and other data retained
by Instagram, can indicate who has used or controlled the
Instagram account.  This "user attribution" evidence is
analogous to the search for "indicia of occupancy" while
executing a search warrant at a residence.  For example, profile
contact information, direct messaging logs, shared photos and
videos, and captions (and the data associated with the
foregoing, such as geo-location, date and time) may be evidence
of who used or controlled the Instagram account at a relevant
time.  Further, Instagram account activity can show how and when
the account was accessed or used.  For example, as described
herein, Instagram logs the IP addresses from which users access
their accounts along with the time and date.  By determining the

physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access, use, and events relating to the crime under investigation.  Additionally, Instagram builds geo-location into some of its services.  Geo-location allows users to "tag" their location in posts and allows Instagram "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner.

62.  Finally, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation.  For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

63.  Therefore, the computers of Instagram are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, transaction information, and other account information.

///

///

///

## XII.CONCLUSION

64.   For the reasons described above, I respectfully submit there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the SUBJECT OFFENSE will be found in the SUBJECT ACCOUNT, as described Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of May
2021.


_____
HONORABLE SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

## **PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the "SUBJECT ACCOUNT" identified as

Instagram user name **minis_6**

that is within the possession, custody, or control of Facebook, Inc. (the "PROVIDER"), a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California 94025, regardless of where such information is stored, held, or maintained.

## ATTACHMENT B

## ITEMS TO BE SEIZED

### I.   SEARCH PROCEDURES

1.   The warrant will be presented to personnel of Facebook, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.    <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for the SUBJECT ACCOUNT listed in Attachment A:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred between February 12, 2021 and the date of this warrant,[8] including:

i.    All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account,

---

[8] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments;

ii.   All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken;

iii. All search history and web history, including web clicks or "History Events," by the user of the SUBJECT ACCOUNT;

iv.   All web browsing activities that are identifiable with the SUBJECT ACCOUNT;

v.   All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

vi.   All communications or other messages sent or received by the account, including via Instagram Direct;

vii. All user content created, uploaded, or shared by the account, including any comments made by the account on photographs, videos, or other content;

viii.   All photographs, videos, images, comments, captions, and hashtags, as well as any metadata associated therewith, in the user gallery for the SUBJECT ACCOUNT;

ix.   All location data associated with the account, or with photographs, videos, or other content, including geotags;

x.   All records of Instagram searches performed by the SUBJECT ACCOUNT, including all past searches saved by the account; and

xi.   All information about connections between the account and third-party websites and applications.

b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the SUBJECT ACCOUNT, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers, or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)   The SUBJECT ACCOUNT;

(II) Any other account associated with the SUBJECT ACCOUNT, including by means of sharing a common secondary, recovery, or alternate e-mail address listed in subscriber records for the SUBJECT ACCOUNT or by means of sharing a common phone number or SMS number listed in subscriber records for the SUBJECT ACCOUNT;

(III)    Any other account accessed by a device with an identifier responsive to the device identifiers called for in paragraph 10.b.iii, below; and

(IV) Any other account associated with the cookie(s) associated with the SUBJECT ACCOUNT.

(V)  All user connection logs and transactional information of all activity concerning the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations;

(VI) Any information identifying the device or devices used to access the SUBJECT ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network

Number ("MSISDN"), International Mobile Subscriber Identifier
("IMSI"), International Mobile Equipment Identity ("IMEI"), or
Apple advertiser ID or ID for advertisers ("IDEFA"), and any
other information regarding the types of devices used to access
the SUBJECT ACCOUNT or other device-specific information;

          (VII)   Any information showing the
location of the user of the SUBJECT ACCOUNT, including while
sending or receiving a message using the SUBJECT ACCOUNT or
accessing or logged into the SUBJECT ACCOUNT;

          (VIII)   Any and all cookies used by any
computer or web browser associated with the SUBJECT ACCOUNT,
including the IP addresses, dates, and times associated with the
recognition of any such cookie;

          (IX) A list of all of the people that the
user follows on Instagram and all people who are following the
user (i.e., the user's "following" list and "followers" list),
as well as any "friends" of the user;

          (X)   A list of all users that the account
has "unfollowed" or blocked; and

          (XI) All privacy and account settings,
including past and present account status.

## III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.   For each SUBJECT ACCOUNT listed in Attachment A, the
search team may seize:

      a.   All information described above in Section
II.10.a. that constitutes evidence, contraband, fruits, or

instrumentalities of violations of Title 18, United States Code, Sections 48(a)(1) (Animal Crushing) ("SUBJECT OFFENSE"), namely:

       i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

       ii.  Any and all contents related to videos, photos, and other visual depictions of animal cruelty.

       iii. Information concerning the payment or transfer of money concerning the SUBJECT OFFENSE.

     b.  All records and information described above in Section II.10.b.

### IV.  <u>PROVIDER PROCEDURES</u>

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

     Special Agent Colin Schmitt
     601 E. Tahquitz Canyon Way, Suite 200
     Palm Springs, CA 92262
     clschmitt@fbi.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.